IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.   No. 11 CR 1386 MV

JAMES JEREMIAH DYSON,

    Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER came before the Court on Defendant Mr. Dyson's Motion to Suppress (Doc. 80).  On April 3, 2013, the Court issued an Order on Motion to Suppress (Doc. 118) denying Defendant's motion.  This Memorandum Opinion and Order sets forth the reasoning for the Court's order.

## FACTUAL BACKGROUND

The initial investigation of this case began when FBI Special Agent Christopher Dotson received information that an IP address located in Los Alamos, New Mexico, had downloaded several images of suspected child pornography by using the peer-to-peer software, Limewire. Subsequently, Agent Dotson determined that the IP address belonged to Defendant's grandfather, Fred Farnsworth.  Agent Dotson obtained a search warrant for Mr. Farnsworth's residence and executed it with several other agents on October 5, 2010.  During the investigation, a team of agents conducted an on-site review for images of child pornography on all of the computer equipment located at Mr. Farnsworth's residence.  No images were found.  During the interview of Mr. Farnsworth, he told Agent Dotson that he had not downloaded any child pornography.  However, he admitted having viewed it in the past.   He also said he was not "computer savvy"; and his entire computer network had been set up by his grandson, Jeremiah

Dyson, the defendant in this case. Mot. Hr'g Tr. (Doc. 98) 120:25. Mr. Farnsworth described Defendant as "brilliant" with computers. Tr. 121:15. Mr. Farnsworth also told Agent Dotson that Defendant frequently visited his house to help care for him, and to sell salvage pieces for him on eBay. During these visits, Defendant would set up his laptop in Mr. Farnsworth's garage. After receiving this information, Agent Dotson contacted FBI Special Agent Richard Murray in the Albuquerque office to conduct a follow-up interview with Defendant.

Later that same day, Agent Murray and Special Agent Thomas Conway went to Defendant's home in Edgewood, New Mexico to interview him about the investigation concerning his grandfather. Upon their arrival, the agents saw Defendant, his wife and one of their two small children in the front yard. Agent Murray advised Defendant that the investigation of his grandfather involved child pornography. Defendant was cooperative and agreed to speak with the agents in his home. Initially, the interview concerned Defendant's grandfather. Consistent with Mr. Farnsworth's statements, Defendant described his relationship with his grandfather; how he helped care for his grandfather because he was ill; how he set up his grandfather's computer system; and how he sold salvage items for his grandfather on eBay. Defendant then discussed his involvement on the Internet, specifically concerning child pornography. Initially, he said he did not search for child pornography. However, later in the interview, he admitted that he deliberately searched for it. Defendant told Agent Murray that he searched the website "4chan" for images of child pornography. Tr. 11:22. Defendant also said that he used the search terms "CP" and "PTHC" which stood for "child pornography" and "preteen hard core." Tr. 31:4-21. Specifically, he told Agent Murray that he "lurked around" on a post called "Old Fags Love CP." Tr. 31:4-6.

During this interview, Defendant denied viewing child pornography for sexual gratification and said he is not attracted to children. (Doc. 80-1 at 7.) He explained in detail that he searched for child pornography to "know what is happening on the Internet." *Id.* at 9. He said he "wants to know what is going on at the level of a monster." *Id.* at 7. He said he considers "the type of information on 4chan to be the dirty underbelly of the Internet." *Id.* at 6. He is "drawn by the nerve of what is popular on the Internet." *Id.* Defendant further said he has never shared images of child pornography with anyone on the Internet. He said he has "inadvertently received child pornography when downloading pirated software." *Id.* at 8.

At the conclusion of the interview, Defendant agreed to provide a written statement concerning his involvement with child pornography. He wrote, "I have viewed websites which include child pornography." *Id.* at 11. He also wrote, "I have never distributed, but have before stored certain files which were illegal." *Id.* He reiterated he did this out of "curiosity about the limits of the internet." *Id.* Defendant was not taken into custody.

Subsequently, based upon Defendant's statements, Agent Dotson notified the Children, Youth and Family Services Department of New Mexico ("CYFD") that child pornography had been discovered at Defendant's residence where he resided with his two young daughters, ages two and five. Based upon this report, Investigator Marshall Hall of the CYFD visited Defendant's residence. Investigator Hall reported to Agent Dotson that he met with Defendant's wife and their two daughters. He advised Agent Dotson that "[h]e did not see any indication that they had been molested in any way. They appeared to have been cared for." Tr. 126:5-7. Investigator Hall further reported to Agent Dotson that he spoke with Defendant on the telephone following his home visit. He said Defendant told him that "anything found in the Farnsworth residence would have been his" referring to child pornography. Tr. 126:10-16.

On October 14, 2010, Defendant voluntarily met with Agent Dotson and Agent Murray at the FBI office in Santa Fe, New Mexico. He was dropped off at the FBI building by his grandfather, passed through the metal detector at the entrance, and was greeted by Agent Dotson, who then led him a brief distance into a nearby conference room to conduct an interview. Agent Dotson did not advise Defendant of his Miranda rights because the interview was not custodial. Agent Dotson advised Defendant that he was free to leave at any time, which he understood. Agent Dotson met with Defendant for about an hour. He told Defendant that the reason he wanted to meet with Defendant was to discuss the issues raised by Defendant in his prior written statement. Defendant agreed to discuss this with him. Defendant said, as he did before, that he inadvertently downloaded child pornography, and that he "was searching for what was out there." Tr. 139:12-13. He also said that, when he would see a file advertising child pornography, his curiosity would be piqued. He "likened it to a worm on a hook and him taking the bait." Tr. 139:20-21. Agent Dotson said Defendant "seemed pleased that it had led to the FBI, because he knew somebody was monitoring the Internet." Tr. 139:22-23. During this interview, Agent Dotson did not discuss the possible prosecution of Defendant's grandfather, nor did Defendant raise it as a concern. Defendant told Agent Dotson that CYFD had visited his home, but did not discuss a concern about losing custody of his daughters.

At some point during Agent Dotson's interview, the discussion turned to whether Defendant had ever had any hands-on sexual contact with any minor children, including his daughters. Defendant denied having any sexual contact with any minor children. Agent Dotson asked Defendant if he would be willing to take a polygraph examination regarding the hands-on touching of minors. Defendant agreed to take a polygraph test for this purpose.

Agent Dotson then met with Special Agent Jennifer Sullivan, the polygraph examiner. Agent Dotson told Agent Sullivan what Defendant had reported to him during his interview. Agent Dotson also told her that he did not believe Defendant's statements about why he searched the Internet for child pornography.  He also said he was concerned about Defendant's two daughters, and wanted to make sure Defendant was not having any sexual contact with them.  At this point, Agent Dotson introduced Defendant to Agent Sullivan.

The polygraph examination was conducted in a nearby smaller room, with only Defendant and Agent Sullivan present.  Initially, Agent Sullivan met with Defendant and explained the polygraph process to him.  She essentially gave him an overview of how the process works.  She told him the process was completely voluntary; and he did not have to take the test.  She told him she would initially go over a consent form and Miranda rights form with him.  Then she told him she would:  gather biographical information from him; discuss his case; discuss the components of the polygraph procedure and how they work; conduct a practice polygraph exam; and then conduct the actual exam.  Defendant appeared to understand the procedure.  After providing him with this overview, Agent Sullivan reviewed two forms with Defendant, a "Consent to Interview with Polygraph" form and an "Advice of Rights" form. (Doc. 80-1 at 16-17.)  Defendant reviewed and signed both of these forms.  He acknowledged that he understood he had a right to have a lawyer present, and the right to stop answering questions at any time.  *Id.* at 16.  He also acknowledged that the polygraph interview was concerning "inappropriate or sexual touching of a minor."  *Id*. at 17.  He further indicated that he understood he could refuse to take the polygraph test; he could stop the test at any time; and he could refuse to answer any questions asked.  *Id.*

Agent Sullivan next interviewed Defendant to obtain biographical information about him. She said the purpose of obtaining this information was to determine whether the defendant was physically and mentally competent to take the polygraph test. After discussing these matters with Defendant, she determined that he was competent to take the test. She then turned the conversation to a discussion of the case. She asked Defendant to explain to her how he got to this point. Defendant told Agent Sullivan that "he had been looking at child pornography on his laptop for the sole purpose of seeing what kind of evils were out there." Tr. 52:8-10. He explained that the only reason he viewed child pornography was to become aware of what was on the internet "so he could be protective of his children." Tr. 52:12-16. He also told Agent Sullivan that he first discovered child pornography a couple of years earlier. He "adamantly denied ever enjoying any of the [child pornography] and further denied ever touching either of his children or any other child inappropriately." (Doc. 80-1 at 19.) Agent Sullivan said the primary focus of the polygraph exam was to determine if Defendant had ever had any sexual conduct with his children or other minors.

Following this interview, Agent Sullivan administered the actual polygraph test, consisting of the following two relevant questions: 1) have you ever touched any minor child in a sexual way; and 2) have you ever touched any minor child under 18 for sexual pleasure? *Id.* Defendant responded "no" to both of these questions. Tr. 53:11. The actual polygraph exam took approximately 23 minutes. Tr. 52:23-25. The results of the polygraph were inconclusive. According to Agent Sullivan, Defendant's internal physiology responded with both deceptive and non-deceptive indicators; resulting in inconclusive test results. Agent Sullivan said this meant Defendant did not pass the test, but also did not completely fail it. Tr. 53:17-23. It was

her opinion that the deceptive indicators on Defendant's test meant he was "withholding information." Tr. 54:1-2.

Following the polygraph, Agent Sullivan interviewed Defendant again. She confronted him and told him that the test results showed that he was withholding information, and that she did not think "everything's out on the table." Tr. 55:2-3. Agent Sullivan said she told Defendant she just "flat out didn't believe what he was saying, that he was searching for these evils to protect his children." Tr. 55:18-20. She further told Defendant, "I feel like you're lying about the reasons you're looking at child porn." Tr. 55:21-22. In response, Defendant initially debated the issue. However, at some point he said, "you're not buying it." Tr. 56:1-3. Agent Sullivan answered, "no" and said, "no judge and jury would even believe that, no one believes people are on the Internet looking at small children, nude small children, because they want to be aware of what's out there." Tr. 56:3-6. Defendant then admitted that he was looking at child pornography for his own personal sexual pleasure.

Agent Sullivan then asked him about his interests in child pornography. He described having been aroused by prepubescent females, but was more attracted to older preteen girls, ages 12 to 14. He also admitted that he masturbated to these images. Agent Sullivan then told Defendant that the inconclusive test results concerned her questions regarding his contact with children. She asked again if he had ever sexually touched his daughters or any other children. Defendant denied that he had.

Agent Sullivan said she did not threaten Defendant at any point during the interview. She said he never asked to stop the interview or leave. She said she did not discuss the possible prosecution of Defendant's grandfather and did not threaten to take Defendant's children away from him. She acknowledged that if Defendant raised the issue concerning his ability to

continue living with his daughters, she likely responded that she did not think it would be allowed. She did not recall such a conversation specifically, but said issues concerning a suspect's children are commonly raised by the interviewee in these circumstances.

After the post-polygraph interview, Agent Sullivan stepped out of the room to report her findings to Agent Dotson. They returned to the room, and went over the information with Defendant again. Defendant admitted to Agent Dotson that he viewed child pornography for pleasure. He described for him the type of pornography he preferred and also said that he masturbated to the images he saw. Tr. 151:8-19. Additionally, Agent Dotson showed Defendant approximately 13 images of child pornography that had been downloaded during the initial investigation of the related IP address. He asked Defendant to review the images and identify any images that Defendant downloaded. Defendant reviewed the images and identified two "as having been definitively downloaded by him." Tr. 153:14-15. At that point, Agent Sullivan asked Defendant if he would be willing to submit to a second polygraph examination at a later date. Defendant agreed to take a second polygraph test. The interview concluded, and Defendant left. According to Agent Dotson, the interview lasted from mid-morning to late afternoon.

On November 4, 2010, approximately three weeks later, Defendant again appeared at the FBI office in Santa Fe, New Mexico. He arrived with his wife and two daughters. Agent Dotson said that he asked Mrs. Dyson to bring the girls to conduct a "safe house" interview regarding any suspected abuse or molestation. Mrs. Dyson refused to be interviewed, but agreed to have the girls evaluated at another location. Agent Dotson escorted Mrs. Dyson and her daughters to another location for the safe house interview.

While Agent Dotson was with Defendant's family, Defendant met with Agent Sullivan for a second polygraph examination. Agent Sullivan reviewed with Defendant an "Advice of Rights" form and a "Consent to Interview with Polygraph" form. Defendant signed both of these forms. (Doc. 80-1 at 23-24.) Having been through the process once before, Agent Sullivan said the second interview went much more quickly. Once they reached the point where they were discussing Defendant's case, Agent Sullivan said that she wanted to get "out on the table and out of the way" the information that came up during the previous interview concerning Defendant's interest in child pornography. Defendant again confirmed that he viewed child pornography for his own sexual pleasure. They then discussed the children that had been around during his life. Defendant gave Agent Sullivan the names of children who were in his life and reported that his mother ran a daycare at their house when Defendant was young.

Agent Sullivan then conducted the polygraph test involving the following two relevant questions: 1) have you ever touched any child on this list in a sexual way; and 2) have you ever touched any child for sexual pleasure? (Doc. 80-1 at 26.) Defendant responded "no" to both these questions. Tr. 66:1. Agent Sullivan determined that Defendant had failed the polygraph, with indications of deception. She confronted Defendant about his responses, indicating that he had failed the test. Nonetheless, Defendant adamantly denied ever having any sexual contact with children. Defendant never changed his response to Agent Sullivan's questions concerning contact with children. He consistently denied ever having hands-on sexual contact with minor children. Therefore, Agent Sullivan concluded the interview and reported her findings to Agent Dotson.

During the second interview, Agent Sullivan said she did not threaten Defendant concerning his grandfather or children, did not restrain him, and never saw Agent Dotson

brandish his firearm as alleged by Defendant. She further denied having any conversation with Defendant about the storybook character "Captain Underpants." Tr. 89:4-16. Likewise, Agent Dotson said that although he wears a firearm, it is concealed under his suit coat. He said that at no time did he brandish his weapon during Defendant's interview. Tr. 158:23 – 159:7. Following Agent Sullivan's interviews of Defendant, she sent the electronic package of the polygraph exam containing the charts, worksheets and score sheets to the FBI headquarters to be reviewed for quality assurance. Tr. 103:13-18.

## ARGUMENT

Defendant argues that the conduct of the FBI agents, in particular Agent Sullivan, rendered involuntary all of the statements he made to the FBI following the polygraph examination on October 14, 2010. Defendant argues that the FBI agents used coercive procedures, intimidation and threats to obtain his statements. He claims that the totality of the following circumstances rendered his statements involuntary:

1. The agents engendered grave fear that Defendant would lose custody of his daughters.

2. The agents prompted Defendant to worry that they would prosecute his grandfather if he did not accept responsibility himself.

3. The interrogation took place in a tightly-controlled, agent-dominated atmosphere far from Defendant's home.

4. The FBI used a polygraph procedure commonly used to induce confessions.

5. Agent Sullivan lied to Defendant about the results of the October 14th polygraph test, telling him he "failed" when, in fact, the results were inconclusive.

      6.      Agent Sullivan followed the polygraph exam with confrontational questions intended to obtain a full-fledged confession.

      7.      The agents continuously interrogated Defendant for many hours.

      8.      Defendant was inexperienced in the criminal justice process.

(*See* Doc. 80 at 1-2; *see generally* Doc. 99 at 1-22.)[1]

## LEGAL AUTHORITY

The burden is on the government to prove by a preponderance of the evidence that a defendant's statement is voluntary. *United States v. Williams*, 576 F.3d 1149, 1162 (10th Cir. 2009). Coercive police conduct, used to overbear a defendant's exercise of his or her own free will, renders the defendant's statement involuntary. *See United States v. Smith*, 606 F.3d 1270, 1276-77 (10th Cir. 2010); *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1153 (10th Cir. 2006). Courts determine voluntariness based upon the totality of the circumstances surrounding the statement. *Williams,* 576 F.d at 1162; *United States v. Nguyen,* 155 F.3d 1219, 1222 (10th Cir. 1998). "No single factor is determinative." *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006) (citation omitted). Relevant factors for the Court to consider include: 1) the defendant's age, intelligence and education; 2) the length of the detention and interrogation; 3) the length and nature of the questioning; 4) whether the defendant was advised of his constitutional rights; 5) whether the defendant was subjected to or threatened with any physical punishment; and 6) whether the defendant was threatened with any other adverse consequences. *See Carrizales-Toledo*, 454 F.3d at 1153; *see also Arizona v. Fulminante*, 499 U.S. 279, 287 (1991).

---

[1] Defendant initially alleged that Agent Dotson "put his hand on his gun during a heated argument between Mr. Dyson and SA Sullivan, putting Mr. Dyson in fear of physical harm." (Doc. 80 at 2.) However, in his closing statement, he acknowledges that the evidence at the suppression hearing did not support this assertion. (Doc. 99 at 1.)

**ANALYSIS**

The Court heard the testimony of Agent Murray, Agent Sullivan, and Agent Dotson concerning their respective interviews with Defendant. The Court finds the agents' testimony credible. The Court also finds that the alleged use of threats and intimidation, especially with regard to the prosecution of Defendant's grandfather and custody of his daughters, is not supported by the evidence. The initial investigation focused on Mr. Farnsworth, a fact made known to Defendant during his first interview with Agent Murray. There is no evidence that, during this interview, Agent Murray or Agent Conway pressured Defendant to make any statements by threatening prosecution of his grandfather if he failed to cooperate. If Agent Murray advised Defendant that his grandfather had "confessed", the statement was not false. Mr. Farnsworth did, in fact, admit to viewing child pornography in the past. During this interview, Defendant voluntarily made statements concerning his involvement with child pornography. He does not challenge the voluntariness of those statements. The two polygraph examinations occurred nine days later and one month later, respectively. Neither Agent Dotson nor Agent Sullivan threatened prosecution of Defendant's grandfather during their interviews with him. To the extent his grandfather was mentioned at all, it appears to have been in the context of how the case came about. If Defendant was concerned about the possible prosecution of his grandfather, such a concern was not the result of coercive police tactics.

Likewise, concerning Defendant's daughters, it is understandable that Defendant would be concerned about the custody of his children. He was under investigation for possessing child pornography and for potentially having sexual contact with them. At the time of the polygraph examinations, the FBI agents were investigating other possible crimes committed by Defendant,

not just child pornography. While Defendant argues that the federal government would not have jurisdiction to actually prosecute a child abuse case against him, the jurisdictional question is not at issue here. The lack of jurisdiction does not bear on the voluntariness of Defendant's statements. The evidence does not show that Agent Dotson or Agent Sullivan threatened to take Defendant's children if he failed to cooperate or confess. There is no evidence of any threats concerning his children. Agent Sullivan only testified that if Defendant had asked her about the custody of his daughters, she would likely have said that she did not believe that he would be allowed to live with them. Defendant argues that the threats were implied because the agents persistently questioned him about having sexual contact with his daughters. However, even if Agent Sullivan's statement and the agents' questioning about contact with his daughters gave Defendant considerable concern about custody, the agents' conduct was not psychologically or physically coercive, and ultimately did not result in a confession of any sort concerning his daughters.

     The Court also considered the environment in which the polygraph tests occurred. The exams occurred in Santa Fe, New Mexico, approximately one hour's drive away from Defendant's home in Edgewood, New Mexico. Defendant arrived voluntarily on both occasions. For the first exam, he was dropped off at the FBI office by his grandfather. Tr. 128:1. For the second exam, he came with his wife and daughters. The building is a secure government office. Therefore, Defendant was required to pass through the metal detectors at the entrance. He was then escorted to the conference room where the interview with Agent Dotson took place. During both exams, while he was in the FBI building, he was not free to move from room to room without an escort. While these security precautions are relevant factors for consideration, the Court finds that the agents also made it clear to Defendant that he was free to stop the interviews

and leave at any time. Agent Dotson advised Defendant at the outset of their meeting that the interview was voluntary, and that he was free to leave at any time. Tr. 137:8-15. Agent Dotson also offered Defendant water and an opportunity to use the rest room to make him more comfortable. Tr. 136:14-19. Later, when Defendant met with Agent Sullivan, she, too, advised Defendant that he was free to stop the interview and leave at any time. Defendant signed a consent form acknowledging that he had been advised that he could leave. Additionally, Defendant was never restrained. Tr. 69:11-14; 148:7-8. The agents did not display any weapons or any other show of force. Tr. 67:1-3; 148:7-8. Therefore, although the interview took place in a confined space within the FBI office, these facts do not support a finding that Defendant was physically restrained or confined such that he would feel that he could not leave or terminate the interview.

The Court also considered the polygraph examination and post-exam interview conducted by Agent Sullivan. It is unclear exactly how long Defendant spent with Agent Sullivan during the first exam on October 14th. Agent Dotson testified that it lasted for about an hour or an hour and a half. Tr. 149:10. However, it appears it likely lasted longer than that, given the fact that the day of the interview began mid-morning and ended late afternoon. The length of time Defendant was questioned could have worn him down physically and emotionally. Furthermore, the process of taking a polygraph test, in and of itself, can be extremely stress-inducing and intimidating.

However, in this case, the polygraph process and interrogation tactics employed by Agent Sullivan did not in fact overbear Defendant's will and result in a confession at all. To the contrary, despite the length of the interview, the manner in which the polygraph exam was conducted and the lengthy post-test confrontational questions posed by Agent Sullivan to

Defendant, Defendant steadfastly maintained that he did not ever engage in sexual contact with his daughters or any other minor. He maintained this position through two separate polygraph examinations, even when confronted with evidence indicating that he was being deceptive or untruthful.[2] Discovering the truth about this issue was the intended purpose of the polygraph examination, not whether Defendant had possessed pornography, a fact he had already admitted.

Moreover, the Court does not find plausible Defendant's argument that all of the questioning by Agent Sullivan and Agent Dotson concerning whether he ever touched any children was really a psychological ruse to intimidate him into admitting that he viewed child pornography for his own sexual gratification. While Agent Sullivan made it clear that she did not believe his claim that he merely viewed child pornography to "search for these evils to protect his children," Tr. 55:18-20, she also made clear that the intended purpose of the interview was to investigate whether Defendant had ever had any hands-on sexual contact with minor children. Defendant read and signed consent forms specifically stating that the first polygraph exam concerned "inappropriate or sexual touching of a minor," and the second exam concerned "any inappropriate sexual touching of a minor (under 18)." (Doc. 80-1 at 17, 24.) Defendant thus was aware of the intended purpose of the polygraph examinations.

Additionally, although Defendant changed his statement concerning the reason he viewed child pornography, ultimately admitting that he took sexual pleasure in viewing it, the Court does not find that Defendant made this admission as a result of coercive police conduct. Following the polygraph text, Defendant initially maintained his position that he only viewed child

---

[2] Defendant claims that Agent Sullivan told him he had "failed" the polygraph exam. However, the only evidence before the Court on this issue is Agent Sullivan's testimony. She said that she told him the test showed that he was "withholding information," and that she did not think "everything's out on the table." Tr. 54:1-13; 55:1-3. She also testified that she told Defendant she "didn't believe what he was saying" and she felt "like [he was] lying." Tr. 55:18-21. Finally, she testified that she told him he was "not being truthful." Tr. 87:4-5, 24. Agent Sullivan never testified that she told Defendant that he failed the first polygraph exam.

pornography to see "what kind of evils were out there." Tr. 52:10. However, when Agent Sullivan told him that she was "not buying it," and did not believe that a judge or jury would believe it either, he changed his statement and admitted that he viewed child pornography for sexual pleasure. Tr. 56:1-8. When asked to describe his interest in it, he offered the type he liked to view most—preteen girls, ages 12 to 14. There is no evidence that this detail was fed to Defendant; rather, he volunteered this additional information himself. Moreover, he admitted that he masturbated to these images. Subsequently, he repeated these statements to Agent Dotson. Three weeks later, before the second polygraph exam occurred, he again reiterated his interest in child pornography. During the second exam, he further admitted his interest was like an addiction or "magnetic thing." Tr. 66:12-14. These descriptions were his own. There is no evidence that they were coerced. Consequently, although the Court is doubtful that Agent Sullivan's verbal disbelief could have been coercive enough to force an involuntary statement, Defendant's own conduct during the first interview with Agent Sullivan and thereafter also undermines Defendant's argument that his confession was coerced.

Finally, the Court considers Defendant's argument that he has only a high school education and minimal experience with the criminal justice system. These facts alone do not support a finding that Defendant did not understand that he could terminate the interviews, or that he was less capable of withstanding pressure to confess. Here, all three agents testified that Defendant had no trouble understanding what they were telling him, and there is no evidence to the contrary. Further, Defendant reviewed and signed two advice of rights forms and two consent to interview with polygraph forms, all of which informed Defendant that he could stop answering questions at any time. (Doc. 80-1 at 16-17, 23-24.)

Therefore, after considering the totality of the circumstances in this case, the Court finds that the government has satisfied its burden of proving by a preponderance of the evidence that Defendant's statements, made on October 14, 2010 and thereafter, were voluntary.

IT IS THEREFORE ORDERED that Mr. Dyson's Motion to Suppress Statements (Doc. 80) is hereby DENIED for the reasons stated herein.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE